J-A27013-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JOHN E. HASSELL | : | |
| | : | |
| Appellant | : | No. 968 EDA 2024 |

Appeal from the Judgment of Sentence Entered November 20, 2023
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0001023-2023

BEFORE:  BOWES, J., MURRAY, J., and BECK, J.

MEMORANDUM BY BOWES, J.:                    **FILED JANUARY 28, 2026**

John E. Hassell appeals from the judgment of sentence of four to eight years of imprisonment, followed by three years of probation, imposed upon his convictions related to a robbery at knife-point.  We affirm.

The trial court provided the following factual background:

> On the evening of January 7, 2023, the complainant, Phillip Balestrieri . . . was walking eastbound in the 100 block of Race Street in Philadelphia, P[ennsylvania] when he encountered a male individual wearing a black/brown ski mask covering his face except the eyes, a hood and dark clothing.  . . .  [T]he male approached [and] asked him the time.  Mr. Balestrieri responded: "It's 9:06."  He recalled the male having "a thicker accent" though "it was a very short conversation."  [The man also asked Mr. Balestrieri where he was from, and when he stated that he was from Wisconsin, the man responded that he was from Pakistan.]  The male . . . then put his arms around Mr. Balestrieri stating "You owe me something.  Give me something" as he was trying to dig into his pockets.  As the male pulled him in tight, he put a knife in front of his chest/stomach area, stating "I'm stabbing you because you're not cooperating."  Mr. Balestrieri immediately grabbed the male's arm attempting to disarm him as they wrestled, falling to

the ground. [The two scuffled on the ground for a few minutes, with the attacker standing over the victim.] The knife pressed into Mr. Balestrieri's hand[,] cutting him. [However, Mr. Balestrieri's hand did not immediately begin to bleed.]

Suddenly Mr. Balestrieri heard another voice say, "Get the eff off of him" and saw the laser [sight] from a gun pointed at the male by another man who exited a car with a woman. The couple attempted to detain the male, but he ran away — taking Mr. Balestrieri's hat — heading westbound on Race Street . . . . The couple called the police prior to stopping for the incident. Mr. Balestrieri was later transported by ambulance to [Thomas Jefferson University Hospital] for superficial wounds to his hand requiring a tetanus shot, bandages, and three to four weeks for recovery.

Police Officer Cesar Torres [of the Philadelphia Police Department] and his partner[,] Police Officer Michael Vu[,] were working nearby in the area of Penn's Landing, Philadelphia when they responded to the area of Delaware and Race Street for a robbery call that came in at approximately 9:12-9:13 p.m. Flash information on the suspect received between 9:15-9:16 p.m. detailed "a black male wearing . . . all black with a ski mask. Last seen in the area or walking . . . west on Race [S]treet." [Mr. Balestrieri later recounted that the attacker was also about his height, five-foot-eleven, or slightly taller.]

At 9:18 p.m. Officer Torres saw Appellant walking alone in the 400 block of Race Street heading westbound wearing "a ski mask rolled up on his head." Officer Torres specified: "I know the ski mask was rolled up . . . but it was still exposing the eye holes on his forehead. That's how I knew it was a ski mask." Appellant was also wearing a "black denim-style jacket." When stopped and questioned about weapons, Appellant stated he had a pocketknife which was recovered from his left back pocket. The knife and ski mask were [seized and] placed on a property receipt. Officer Torres further testified the location of Appellant's stop was [four] to [five] blocks away from the scene of the robbery, a distance that would take approximately a six minutes [*sic*] to walk. Appellant was transported to the location of the incident where Mr. Balestrieri identified the knife used[, recognizing its tip, and identified Appellant as his assailant].

Trial Court Opinion, 5/1/24, at 2-4 (cleaned up).

Appellant was arrested and charged with one count each of possession of an instrument of a crime, terroristic threats, simple assault, recklessly endangering another person ("REAP"), theft by unlawful taking, and receiving stolen property, as well as two counts each of robbery and aggravated assault. He filed a motion to suppress the knife obtained during the stop and the victim's identification of Appellant at the crime scene. Pertinently, Appellant maintained that Officer Torres did not have reasonable suspicion to stop him.

The court held a hearing on the motion before the Honorable Nicholas S. Kamau, at which Mr. Balestrieri, Officer Torres, and Officer John Teetz of the Philadelphia Police Department testified. Officer Teetz explained that he received a call at 9:12 p.m. reporting a robbery in progress. He responded on scene and at 9:15 broadcast over the police radio a description of the suspect, which he had obtained from the victim and the two good Samaritans. The flash stated that a black male wearing a black ski mask and black jacket had just committed a robbery at knife-point and was last seen heading west on Race Street.

Officer Torres testified that he and Officer Vu were patrolling nearby when they heard the flash. As they were driving eastbound in their marked vehicle on Race Street, they spotted Appellant, a black male "wearing . . . a black ski mask rolled on top of his head . . . [and] a black jacket[,]" walking westbound. *Id*. at 48. The officers proceeded around the block, and having observed no other individuals, they returned to the area to investigate. Officer

- 3 -

Torres stopped Appellant at approximately 9:18 p.m. He explained that Appellant's black ski mask "got [his] attention," and noted that Appellant was "walking from the direction of the robbery[, and t]he time was right" such that his location was a five-to-six minute walk from the scene of the robbery. *Id*. at 50.

At the conclusion of the hearing, the suppression court issued findings of fact and conclusions of law. Specifically, it stated that Officer Torres had reasonable suspicion to detain Appellant because he matched the physical description provided in the flash, there were no other individuals in the vicinity, and he was four to five blocks from the scene approximately five minutes after the crime occurred. Accordingly, the court denied Appellant's motion with respect to the knife.[1]

The same day, the matter proceeded to a bench trial before the Honorable Roxanne E. Covington.[2] Officer Torres and the victim attested to the aforementioned facts, and the Commonwealth played the bodycam footage obtained from Officer Torres, wherein Appellant's voice could be heard. Appellant did not testify, but the parties stipulated that two character

---

[1] However, the court granted the motion as to the victim's identification of Appellant at the scene of the crime because it was unduly suggestive.

[2] The record reflects that Judge Kamau did not preside over the bench trial due to a scheduling conflict.

witnesses would have attested to his reputation in the community for being a peaceful, nonviolent person.

The court convicted Appellant of all charges, except REAP and one count of robbery and aggravated assault. It explained that:

> [It took] note of the proximity of time, place, [and] location from the first encounter between Mr. Balestrieri and his assailant to the incident, from the radio call, and the stop of [Appellant], the fact that the weapon matche[d] the description of the item used in the robbery and found on [Appellant], as well as the ski mask that was still worn by [Appellant], and also the primary identifier of a distinctive voice, which could be confused or attributed to an accent.

N.T. Bench Trial, 7/7/23, at 119-20. The court thereafter sentenced Appellant as indicated above.

Appellant submitted a post-sentence motion, seeking a new trial and reconsideration of his sentence, arguing, *inter alia*, that the verdict was against the weight of the evidence. By operation of law, the motion was denied. Appellant timely appealed.

The trial court issued an order directing Appellant to file a concise statement in accordance with Pa.R.A.P. 1925.[3] He timely complied. Multiple responsive Rule 1925(a) opinions followed. Judge Kamau addressed the

---

[3] We remind the trial court that all Rule 1925 orders must specify, among other things, "that the Statement shall be served on the judge pursuant to paragraph (b)(1) and both the place the appellant can serve the Statement in person and the address to which the appellant can mail the Statement[,]" and "that any issue not properly included in the Statement timely filed and served pursuant to subdivision (b) **shall** be deemed waived." Pa.R.A.P. 1925(b)(3)(iii)-(iv) (emphasis added).

denial of the suppression motion, and Judge Covington considered the remainder of the issues. However, Judge Covington did not examine Appellant's claim that the verdict was against the weight of the evidence, despite being properly preserved in both the post-sentence motion and the Rule 1925(b) statement. Therefore, we remanded this matter for the court's analysis of this issue. *See Commonwealth v. Hassell*, 339 A.3d 432, 2025 WL 1179258 (Pa.Super. 2025) (non-precedential decision). Judge Covington followed our directive and provided a supplemental Rule 1925(a) opinion addressing the weight of the evidence. This matter is now ripe for review.

Appellant raises the following questions for our consideration:

1. Did the conviction for a robbery violate state and federal due process rights because the evidence was insufficient to establish that [Appellant] was the one who committed the crime?

2. Was the verdict against the weight of the evidence where the trial judge did not consider any of the strong exculpatory evidence, and injected herself as a "witness" by relying on "evidence" that was not part of the trial record in arriving at her verdict?

3. Did the suppression court err by finding that there was reasonable suspicion to stop [Appellant]?

Appellant's brief at 2.

We begin with Appellant's claim regarding the sufficiency of the evidence for his conviction of robbery:

The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh

the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact[,] while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Travinski*, 346 A.3d 787, 791 (Pa.Super. 2025) (cleaned up).[4]

Appellant does not contest that the Commonwealth proved that Mr. Balestrieri was the victim of a robbery as that offense is defined by 18 Pa.C.S. § 3701(a)(1)(ii). Rather, Appellant maintains that the Commonwealth's evidence did not produce sufficient evidence to prove that he was the person who committed the robbery. It is axiomatic that, in addition to the elements

---

[4] Appellant also appears to challenge the court's denial of his pretrial petition for writ of *habeas corpus*, wherein he tested the sufficiency of the Commonwealth's evidence at the preliminary hearing. **See** Appellant's brief at 24 (citing **Jackson v. Virginia**, 443 U.S. 307 (1979), to state that it sets forth "the standard for prevailing on a due process *habeas corpus* claim based on an insufficiency claim"). However, since Appellant has been convicted, that issue is moot. **See also Commonwealth v. Troop**, 571 A.2d 1084, 1088 (Pa.Super. 1990) (explaining that "the failure to establish a *prima facie* case at a preliminary hearing is clearly immaterial where at the trial the Commonwealth met its burden by proving the offense beyond a reasonable doubt" (cleaned up)).

of a crime, "the Commonwealth must also establish the identity of the defendant as the perpetrator[.]" ***Commonwealth v. Torsunov***, 345 A.3d 339, 347 (Pa.Super. 2025) (cleaned up). We have explained that "[d]irect evidence of identity is, of course, not necessary and a defendant may be convicted solely on circumstantial evidence." ***Commonwealth v. Strafford***, 194 A.3d 168, 176 (Pa.Super. 2018) (cleaned up).

Appellant believes that the Commonwealth did not meet its burden in establishing that he was the individual who robbed Mr. Balestrieri. He asserts that "[v]iewing only the evidence of record relied on for a finding of guilt by the trial judge, this Court should conclude that it is so deficient that the Court should arrest judgment." Appellant's brief at 19. He summarizes:

> [T]he Commonwealth evidence that the trial judge relied on to convict [Appellant] as the robber was [as follows]: [Appellant] was walking a few blocks from the scene of the robbery six or seven minutes later, he "matched" the description of dark clothing and wearing a black ski mask (rolled up on his head), and he was carrying a common standard pocketknife just like the one used by the robber.

***Id***. at 17-18. Appellant explains that Mr. Balestrieri: (1) failed to identify key features of the absconder, such as eye color; (2) only recognized that the knife had a tip, which is common of all knives; and (3) incorrectly stated that Appellant was the same height as him when Mr. Balestrieri is four inches shorter than Appellant. ***Id***. at 14-17.

Appellant further complains that the trial court ignored evidence supporting his innocence. He states that it "omitted from [its] analysis . . .

the trial evidence seriously undercutting any inference of guilt from these facts," including that he did not attempt to evade officers and was otherwise acting normally. *Id*. at 19-20. The only thing that the victim remembered besides the clothing description, Appellant explains, is that the suspect had a Middle Eastern accent. *Id*. at 21. Appellant states, however, that there was no testimony to confirm that he spoke with an accent, and Judge Covington erred in "commenting on his voice based on her hearing it pre-trial." *Id*. at 21 n.6. He additionally points out that the knife had cut the victim's hand, and when officers detained Appellant and confiscated his knife, there was no blood on it. *Id*. at 22. Finally, Appellant contends that the trial court failed to consider the stipulation that two witnesses would have attested to his good reputation and character. *Id*.

Appellant's arguments fail to align with our standard of review, which requires us to review all evidence of record in a light most favorable to the Commonwealth. *See Travinski*, 346 A.3d at 791. The trial court, sitting as fact-finder, was also free to disbelieve any evidence it deemed incredible. *Id*.

With this standard in mind, the record bears out that Mr. Balestrieri's testimony alone provided sufficient circumstantial evidence to identify Appellant as the perpetrator of the robbery. He provided the officers with a description of the assailant as a black male, wearing a black ski mask and black jacket, who took off heading west on Race Street. He later added that the suspect was of the victim's approximate height or taller. Appellant, who

was heading westbound on that street, five to six minutes after the crime occurred and four or five blocks away from the scene, matched that description. Officer Torres confirmed that it would take that amount of time to walk from the scene of the crime to Appellant's location. The victim's hand was also cut by a pocketknife, and Appellant possessed such a weapon when he was apprehended. Mr. Balestrieri further clarified that although the knife sliced his hand, it did not immediately bleed. Moreover, this Court reviewed the bodycam footage admitted at the bench trial, which verified that Appellant spoke with an accent consistent with Mr. Balestrieri's description. This evidence adequately allowed the court to conclude beyond a reasonable doubt that Appellant was the culprit. *See Strafford*, 194 A.3d at 176. Thus, he is not entitled to relief.

Appellant next assails the weight of the evidence. We consider this issue as follows:

> Our standard of review in addressing weight of the evidence claims is whether the trial court has exercised an abuse of discretion by overriding or misapplying the law or rendering a judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record. Appellate review of a weight claim is a review of the exercise of discretion, not the underlying question of whether the verdict is against the weight of the evidence. Where the record adequately supports the trial court, the trial court has acted within the limits of its discretion.
>
> Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is or is not against the weight of the evidence. Accordingly, for

an appellant to prevail on a challenge to the weight of the evidence, the evidence must be so tenuous, vague, and uncertain that the verdict shocks the conscience of the court.

***Commonwealth v. Williamson***, 330 A.3d 407, 419 (Pa.Super. 2025) (cleaned up).

Appellant argues that the trial court's "conclusions were manifestly unreasonable, the result of giving effect to the will of the judge, rather than being based on a dispassionate review of the entire evidence at trial." Appellant's brief at 26-27. He highlights that "no evidence" was introduced to establish that he "had a thick Middle Eastern accent" given that he did not testify. *Id*. at 27. He therefore contends that the judge improperly opined that Appellant had an accent where the record does not support such a determination. *Id*. at 27-28. He also repeats his assertion that the court ignored pertinent evidence establishing his innocence, such as the victim failing to provide a detailed description of the attacker and the fact that Appellant was acting normally when stopped. *Id*. at 28.

The trial court determined that the weight of the evidence was not against the verdict. Rather, the court concluded that Appellant committed the robbery considering the "arrest in proximity, time, and location from the encounter, as well as [Appellant's] strong physical match to the flash description." Suppression Court Opinion, 5/29/24, at 4. It also mentioned that it deemed the victim credible, specifically Mr. Balestrieri's assertion that Appellant spoke in an accent, and "noted Appellant's unique voice could be

- 11 -

mistaken for an accent." *Id*. at 3. The court further confirmed that it considered the character evidence presented by Appellant, but clarified that it "did not tip the balance in Appellant's favor." *Id*. at 4.

We discern no abuse of discretion. Appellant asks this Court to reweigh the evidence that the trial court already considered, which contradicts our standard of review. *See Williamson*, 330 A.3d at 419. The court also did not act with bias, ill-will, or partiality when it stated that Appellant spoke with an accent. Although he did not testify, Appellant's voice is discernable on the bodycam footage that was introduced at trial. Appellant has therefore failed to establish that the trial court abused its discretion in declining to find that the evidence was so "tenuous, vague, and uncertain" that the verdict would shock its conscience. *Id*.

Finally, Appellant asks us to reverse the court's refusal to suppress the knife. The following law guides our analysis:

> An appellate court's standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, the appellate court is bound by those findings and may reverse only if the court's legal conclusions are erroneous. Where the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression

- 12 -

court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to plenary review.

*Commonwealth v. Smith*, 164 A.3d 1255, 1257 (Pa.Super. 2017) (cleaned up).

Unreasonable seizures are prohibited by the Fourth Amendment. *See Commonwealth v. Ewida*, 333 A.3d 1269, 1275 (Pa.Super. 2025). Our caselaw categorizes the following three types of warrantless interactions between citizens and police officers that must be justified by varying degrees of suspicion:

> The first of these is a "mere encounter" (or request for information) which need not be supported by any level of suspicion, but carries no official compulsion to stop or to respond. The second, an "investigative detention" must be supported by a reasonable suspicion; it subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest. Finally, an arrest or "custodial detention" must be supported by probable cause.

*Commonwealth v. Sanchez*, 326 A.3d 926, 933 (Pa.Super. 2024) (cleaned up).

This matter concerns an investigative detention, and the requisite reasonable suspicion to initiate such an encounter requires an officer to recount "specific and articulable facts that led the officer to believe that criminal activity was afoot, considered in light of the officer's training and experience." *Commonwealth v. Adams*, 205 A.3d 1195, 1205 (Pa. 2019) (cleaned up). Importantly, "[i]t is not the function of a reviewing court to analyze whether each individual circumstance gave rise to reasonable

suspicion, but rather to base that determination upon the . . . the whole picture." *In re D.M.*, 727 A.2d 556, 559 (Pa. 1999) (cleaned up).

When analyzing whether a police officer acted reasonably in stopping a suspect, we must consider factors such as "tips, the reliability of the informants, time, location, and suspicious activity." *Commonwealth v. Mackey*, 177 A.3d 221, 229 (Pa.Super. 2017) (cleaned up). As to the trustworthiness of supplied information, "while an officer is prohibited from relying on an unparticularized suspicion or a hunch as a basis for [an investigative detention], he or she may rely on a police radio broadcast if the suspect matches the specific description given by the individual who reported the crime." *Commonwealth v. Thran*, 185 A.3d 1041, 1046 (Pa.Super. 2018) (cleaned up). Additionally, "[i]n assessing the totality of the circumstances, courts must also afford due weight to the specific, reasonable inferences drawn from the facts in light of the officer's experience and acknowledge that innocent facts, when considered collectively, may permit the investigative detention." *Commonwealth v. Parker*, 161 A.3d 357, 362 (Pa.Super. 2017) (cleaned up).

The suppression court provided the following analysis of its denial of Appellant's motion:

> In the instant case, Officer Torres responded to flash information regarding a robbery that took place on the 100 block of Race Street shortly after 9:00 p.m. At 9:15 p.m., Officer Torres spotted Appellant walking near the intersection of 5th and Race Streets. Appellant fit the flash information given over police radio moments earlier – black male with a ski mask and black jacket last seen

- 14 -

traveling westbound on Race Street. With regard to the ski mask, Officer Torres testified that the eye holes were still visible even though the mask was partially rolled up. . . .

Based upon the totality of the circumstances, the officers had reasonable suspicion to believe that Appellant was involved in [Mr.] Balestrieri's knife-point robbery. As a result, the pedestrian stop and investigative detention were justified.

Suppression Court Opinion, 5/29/24, at 4 (some capitalization altered).

Appellant maintains that "there was no requisite reasonable suspicion for believing he had committed the knife-point robbery, the basis for the stop." Appellant's brief at 32. Since the flash only stated that the robber was "a black male with black ski mask and black jacket[,]" he contends that it was "the skimpiest of descriptions" that any black male could have fit. *Id*. at 33. He emphasizes that he did not attempt to evade officers as he walked down Race Street, and there was nothing unusual about wearing a ski mask in January. *Id*. at 32-33. He asserts that if he were "the knife-wielding robber, he made a very strange decision to just stroll down the same street where he had committed the crime for the next six or seven minutes rather than flee to avoid the police." *Id*. at 36. Appellant relies upon *Commonwealth v. Berrios*, 263 A.2d 342 (Pa. 1970), and *In re D.M.* to support his conclusion that "there was no reasonable suspicion to believe that [he] was the particular individual who committed the crime." *Id*. Specifically, Appellant asserts that like the suspects in *Berrios*, his location was inconsistent with fleeing the scene of a crime, and unlike the absconders in *In re D.M.*, he "did not act furtively when he saw the police." *Id*.

- 15 -

In *Berrios*, officers received a flash that two black males in dark clothing and one Hispanic male in light clothing had just fled from a shooting. Twenty minutes later, officers stopped one black man in dark clothing and one Hispanic man in light clothing only three blocks away from the crime scene. The High Court concluded that the officers "had no reason to connect [these suspects] with the reported shooting, except that they were walking near the area; that one was [black] and the other was [Hispanic], who wore clothing of the general color reportedly being worn by those involved." *Berrios*, 263 A.2d at 344. Additionally, these men were "merely walking on the street and acting in a normal manner." *Id*. Consequently, the Court concluded that the officers were not justified in their detainment.

By contrast, in *In re D.M.*, officers received a radio call reporting that "several black males" were involved in a robbery. *Id*. at 557. "Approximately one or two minutes after receiving the call, a short distance from the crime scene, the [responding] officer observed [the] appellant and three other black males walking north 'very quickly'" on the same street as the robbery. *Id*. When the officer looked at them, "they immediately changed their direction." *Id*. Additionally, these men "were the only individuals in the vicinity." *Id*. The Court held that the officer was justified in apprehending them because:

> [the] appellant and his companions matched the number of suspects broadcast in the report; they matched the race of the suspects; they were the only individuals observed in the vicinity of the robbery; they were seen a mere one-half block away within approximately one minute of the crime; and they acted evasively when they saw the police vehicle.

- 16 -

*Id*. at 558.  Moreover, the Court noted that "the police radio report came from the crime victim herself, not from an anonymous source, [which] imparted a high degree of reliability to the report."  *Id*.

The *In re D.M.* Court also distinguished *Berrios*.  Notably, it explained that because the suspects in *Berrios* were apprehended only three blocks from the scene of the crime, but twenty minutes thereafter, their locale was inconsistent with flight.  Additionally, the suspects in *Berrios* did not attempt to evade police officers or otherwise act suspiciously.  *Id*. at 560.

Appellant's discussion of *Berrios* and *In re D.M.* is unpersuasive.  The fact that Appellant did not abscond from Officer Torres does not negate the other factors which provided the officer with the requisite reasonable suspicion to stop him.  *See Parker*, 161 A.3d at 362 ("In assessing the totality of the circumstances, courts must also afford due weight to the specific, reasonable inferences drawn from the facts in light of the officer's experience and acknowledge that innocent facts, when considered collectively, may permit the investigative detention." (cleaned up)).  *See also In re D.M.*, 727 A.2d at 559 (stating that the appellant "overlook[ed] the mandate that reasonable suspicion must be evaluated based on the totality of the circumstances" where his brief was "devoted to citing cases which hold that certain factors . . ., standing alone, are insufficient to constitute reasonable suspicion").

Plainly, *Berrios* is inapposite.  Unlike in that case, Officer Torres spotted Appellant walking west on Race Street, four blocks away from the crime scene,

and only five minutes after the suspect took off. Officer Torres knew that it took approximately five minutes to walk from the scene of the crime to where he spotted Appellant. His proximity to the crime scene was thus entirely consistent in terms of timing and distance. Therefore, **Berrios** does not support Appellant's argument.

Instead, this case is akin to **In re D.M.** Officer Torres relied upon an inherently trustworthy description provided by Mr. Balestrieri and broadcast over the police radio, which was issued only a few minutes after the suspect had fled. The officer stopped Appellant almost instantly after hearing the flash because he met the physical description of the absconder, and his clothing matched the report, which was significantly more detailed than the one provided in **In re D.M.** Also, Officer Torres decided to stop Appellant after taking a loop around the block and failing to see any other individuals in the area. Hence, despite Appellant's assertion, **In re D.M.** is apt.

In sum, the victim provided a verifiable description of the suspect; Officer Teetz relayed that information over the police radio; Officer Torres spotted Appellant two minutes after receiving the flash; Appellant was walking on Race Street away from the crime scene; he matched the physical and clothing description of the suspect; his location was consistent with someone who had fled from the crime scene five minutes prior; and he was the only individual in the vicinity. Thus, Officer Torres had specific and articulable facts

that led him to believe that Appellant was the perpetrator of the crime. ***See***

***Adams***, 205 A.3d at 1205. No relief is due.

To conclude, Appellant has not provided any basis for this Court to determine that the evidence was insufficient to convict him of robbery, that the verdict was against the weight of the evidence, or that the suppression court erred in denying his motion. Accordingly, we affirm his judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 1/28/2026